# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 17-959

**STATE OF LOUISIANA**

**VERSUS**

**DIRK DOUGLAS THOMAS AKA DIRK THOMAS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 12-1039
HONORABLE ANTHONY THIBODEAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and Candyce G. Perret, Judges.

**AFFIRMED. MOTION TO WITHDRAW GRANTED.**

**M. Bofill Duhe**
**District Attorney – 16th Judicial District**
**300 Iberia Street - #200**
**New Iberia, LA 70560**
**Telephone: (337) 369-4420**
**COUNSEL FOR:**
> **Plaintiff/Appellee - State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P. O. Box 2125**
**Lafayette, LA 70502**
**Telephone: (225) 806-2930**
**COUNSEL FOR:**
> **Defendant/Appellant - Dirk Douglas Thomas aka Dirk Thomas**

**Dirk Thomas**
**Pro Se**
**1506 Lakeside Drive**
**New Iberia, LA 70560**
**Telephone: (337) 766-2760**
**Defendant/Appellant**

**THIBODEAUX, Chief Judge.**

Defendant Dirk Douglas Thomas was charged with one count of sexual battery, and a jury unanimously found him guilty of the lesser included offense, attempted sexual battery, in violation of La.R.S. 14:27 and La.R.S. 14:43.1. He was sentenced to eighteen months imprisonment at hard labor, to be served without the benefit of probation, parole, or suspension of sentence. On appeal, Thomas asserts that the evidence was insufficient to support his conviction and challenges his sentence as unconstitutionally excessive.

After concluding no non-frivolous issues exist upon which to base an appeal, appellate counsel has filed a brief requesting only a review for errors patent, and he now moves to withdraw from the appeal.

For the following reasons, this court grants counsel's Motion to Withdraw and affirms Thomas's conviction and sentence.

I.

## ISSUES

We must decide:

(1)    whether the record reveals on its face errors patent sufficient to reverse Thomas's conviction and sentence;

(2)    whether the evidence introduced at trial, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979) standard, was insufficient to support Thomas's conviction of attempted sexual battery in violation of La.R.S. 14:27 and La.R.S. 14:43.1;

(3)    whether the sentence imposed by the trial court is excessive, in violation of the Eighth Amendment of the Constitution of the United States and La.Const. art. 1, § 20; and

(4) whether appellate counsel has thoroughly reviewed the record and correctly determined that no non-frivolous issues exist such that he may be permitted to withdraw from the appeal.

## II.

## FACTS AND PROCEDURAL HISTORY

On April 5, 2012, Defendant Dirk Thomas's adult biological daughter, D.T.,[1] contacted law enforcement alleging that Thomas had sexually assaulted her on the night of April 3, 2012.  The State filed a bill of information charging Thomas with one count of sexual battery.  Thomas waived formal arraignment on all charges and pled not guilty.  After a trial on the merits, the jury unanimously found Thomas guilty of attempted sexual battery.  The trial court sentenced Thomas to eighteen months imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.

At the time of trial, D.T. was twenty-eight years old.  She was the first witness called to testify.  On direct examination, D.T. testified that she and her father had an estranged relationship, visiting each other sporadically over the years, with both parties living in different parts of the country at different times.  As she grew older, she sought to build a relationship with her father, and the two became close after she became pregnant with her son.

Thomas owned and operated several properties in New Iberia, Louisiana.  Because D.T. was unable to afford living on her own, Thomas offered to let her and her son live in his townhouse in New Iberia, and she agreed and stayed

---

[1]In accordance with La.R.S. 46:1844(W), initials are used to preserve the confidentiality of crime victims who are minors, victims of sex offenses, and victims of human trafficking-related offenses.

there until she joined the Army in 2008. In 2010, D.T. left the Army and returned to Louisiana. D.T. stated Thomas again offered to let her live in the New Iberia townhome and that Thomas additionally offered to let D.T. work for him in managing his properties, which she accepted. D.T. moved into townhome A with her son, who was four or five at the time, while Thomas lived in townhome B. She further stated that due to ongoing renovations, Thomas and whoever else was working would enter the townhome at any given time.

D.T. testified that her relationship with her father was growing into both a friendship and a father-daughter relationship. They began talking and texting often, and D.T. found that she and Thomas had a lot in common. D.T. identified State's Exhibit Number 1 as a printout of the text messages between herself and Thomas. Thomas is listed in her contacts as "Dad Thomas." As discussed below, the trial court ruled the printout of the text messages to be inadmissible, but it allowed the introduction of State's Exhibit Number 2, a download of the information from D.T.'s cellular phone containing the same information.

On the night of April 3, 2012, D.T. testified that she and Thomas went upstairs to watch a movie in her bedroom while her son was asleep in the next room. Thomas commented on her body, and then licked her buttocks, which D.T. laughed off at the time, and Thomas left the room afterwards. Thomas returned and then attempted to remove D.T.'s underwear. After repeatedly telling Thomas to stop, D.T. realized that Thomas was not joking and she fought to keep her underwear on. Thomas then pinned her down with his upper body while using his hand to remove her underwear, and proceeded to lick her genitalia several times. Thomas left around 1:00 a.m. when the movie was over, and D.T. tried to call her boyfriend. When her

boyfriend did not answer, she testified that she just lay there and cried in disbelief at what her father had done to her.

The next morning, D.T. called her mother to help her find a new place to live. When her mother asked why, D.T. initially told her that she noticed things around the townhouse that made her uncomfortable, like that her underwear had been rummaged through and only Thomas could have done so. While looking for apartments, D.T. eventually told her mother the details of the night before. As a result of the conversation with her mother, D.T. called the police station to ask if she could record conversations as evidence. After someone at the police station told her that she could, she began recording her conversations with Thomas. When D.T. believed she had obtained substantial recordings, she then sought out law enforcement.

D.T. provided law enforcement with four separate recorded conversations, all of which the listener was able to identify Thomas as the person on the other end of the conversation. On direct examination, D.T. identified State's Exhibit Number 3 as copies of the recordings she had made. D.T. recognized the exhibit from her meeting with the prosecutor when D.T. verified both that she was on the recordings and that she had made the recordings, after which she signed and dated the exhibit. D.T. listened to the recordings and confirmed they were accurate. D.T. identified the speakers in the conversations as herself and Thomas. She further claimed that she made the recordings to support her claims because there was no physical evidence of the incident.

On cross examination, D.T. was unsure of whether the incident occurred on April 2 or April 3, because four years had since passed. However, D.T. was able to confirm that a day or two before the incident, Thomas told her over lunch

4

that D.T. would not be in his will as he preferred to leave his estate to his Caucasian stepchildren instead. She insisted that she was not angry, nor was there an argument over the will, but rather a general conversation. On redirect examination, D.T. elaborated that she was not upset because she did not expect to be in his will as the two had never had much of a relationship.

D.T. confirmed Thomas was able to completely remove her underwear during the incident. She stated that she gave up both physically and emotionally, and eventually stopped struggling because she did not want to hurt him and just wanted him to stop. She did not recall telling the officer she stopped fighting. D.T. stopped fighting because it was ineffective anyway; it was not stopping him.

D.T. testified that she continued living at the townhouse for about a week and a half after the incident until the time Thomas was served with the restraining order, which occurred a few days prior to his arrest. D.T. also continued to work for and communicate with Thomas in an attempt to gather evidence to prove her claim, as there was no other evidence. Having to communicate with Thomas bothered D.T. because Thomas acted as if everything was okay, and so she felt like she too had to act as if everything was okay when speaking to him.

Defense counsel asked D.T. to explain some of her text message conversations with Thomas as represented in State's Exhibit Number 2, after suggesting that Thomas lived with D.T. and that they had a consensual sexual relationship. When defense counsel further suggested that D.T.'s conversations with Thomas were inappropriate, D.T. responded that she spoke to him in the same way that she spoke to her mother and sister. Defense counsel then inquired into the conversations she had with other family members concerning her various relationships, to which D.T. firmly responded she was only in one relationship at the

5

time, and further that she was excited to introduce her boyfriend to her father as she had never introduced anyone to her father before. D.T. clarified she told her father about the various men who had "hit on" her, but she was only in a relationship with the one person.

When the State asked D.T. about the text messages, D.T. recalled Thomas texting her a message that read, "I have seen you walk away. I can't handle you on my best day. You in stilettos, I'd just be a minute, man. LMAO." Another message from Thomas read, "Your father is a well-endowed man that hits really hard and lasts a very long time. In other words, I'm a cunt's worst nightmare." At the time, D.T. believed Thomas was joking with her in a sexual manner. At the time of trial, however, D.T. had come to realize the messages indicated Thomas did not see her as a daughter, but rather as a woman in a sexual fashion.

Lisa Burgess, D.T.'s mother, testified that she and Thomas were never married, but that they dated and lived together for about three years. She also stated that Thomas had physical contact with D.T. maybe three times throughout D.T.'s adolescence, but that he financially supported D.T. from the ages of five to eighteen.

Ms. Burgess recalled that on the morning of April 4, D.T. came to her house to talk, and she asked D.T. if anything was wrong because something seemed a little different. Initially, D.T. responded that nothing was wrong, but eventually told her mother that something bad had happened. Ms. Burgess again asked D.T. what was wrong when D.T. began shaking, crying, and hyperventilating. Ms. Burgess recalled the details of the incident as relayed to her by D.T., stating that Thomas had forced D.T.'s legs open and performed oral sex on her.

Ms. Burgess testified that she then advised D.T. to call the police, but that D.T. was afraid initially. Ms. Burgess then suggested that D.T. stay at the

townhouse for a few days to collect evidence, as Thomas would become aware that D.T. told her mother of the incident if she were to move in with Ms. Burgess, and "cut all ties" thereafter. Shortly after the incident, Ms. Burgess recalled that she noticed great changes in D.T., and that D.T. was not like herself. After a couple of months, however, D.T. would no longer speak of the incident with Ms. Burgess.

Ms. Ashley Hammons testified at trial that she was employed by the Iberia Parish Sheriff's Office as a sergeant in detectives. She was able to record D.T.'s recordings using her work phone and transferred the files onto a compact disc. The court played the compact disc for the jury. The State then rested subject to rebuttal. State's Exhibit Number 3 contains four recordings labeled: 33271; 47209; 47210; and 47831.

In 47209, D.T. explained that she was not good face-to-face and that she liked their relationship. D.T. asked "Daddy" to listen and asked him the reason why he, "you know." "Daddy" promised they would talk but not like "this." D.T. said she would like to go with him and continue to work for him. "Daddy" said there were several reasons for "what transpired," and one reason was that "you always say people make you do things you don't want to do."

In 47210, "Daddy" talked about being a very strong-willed person. D.T. asked if it was because she did things she did not want to do. D.T. then asked if her "Daddy" wanted to have oral sex with her because he did not think she was his daughter. "Daddy" asked what she was talking about and said he was lost. When D.T. repeated the sentiment that she thought the reason he did it was because he did not think she was his daughter, "Daddy" said they would talk about it later. D.T. explained that she liked their relationship and that she did not want him to look at

7

her as if she was not his daughter. "Daddy" said for D.T. to take her son on his field trip and that they would talk when he got back.

In 47831, a male voice answered D.T.'s call and stated, "Dirk speaking." D.T. expressed that the two had "never really talked about anything," to which "Dirk" responded that they would talk about it when D.T. settled down. The following exchange occurred:

> Female voice: "No, okay, see, I can never settle down because it's always on my mind. I feel like you never even apologized for it. Like . . ."

> Male voice: "Listen, listen, I don't like talking over the phone. What happened, it happened in person. We gonna talk about it in person."

> Female voice: "All right."

> Male voice: "Okay? Girl, don't, don't think about it. It was a test. I had to test you. I had to test you."

> Female voice: "You had to test me by going to the extremities of taking off my underwear and doing all of that? Daddy, are you serious?"

> Male voice: "I'm serious. You have to go to the extreme with you because (inaudible) you don't know you like I know you. I found out, I found out more about you, now, than I ever did."

> Female voice: "Okay, but even, even if so, like, why would I let my Daddy do that to me. Like, okay, why wouldn't I be, like, okay, really?"

> Male voice: Hold up, hold up, hold up. I'm not going to discuss it over the phone.

> Female voice: "All right, all right. Bye, Daddy."

The first witness called by the defense was Robert Hamilton, D.T.'s cousin and Thomas's nephew. Mr. Hamilton was present at the lunch meeting at which Thomas informed D.T. that she would not be in his will. Mr. Hamilton

8

testified that the conversation was more like an argument, and that D.T. was loud, mad, and appeared upset about the situation. On cross-examination, Mr. Hamilton testified that he had previously worked for Thomas for two and a half years. Mr. Hamilton also testified that he had never seen any sexual assault occurring between D.T. and Thomas.

The second witness called by the defense was Felicia Thomas, Thomas's sister. She testified that prior to the incident, Thomas was living in Ann Arbor, Michigan. Ms. Thomas then stated that Thomas occupied the same townhouse as D.T. and her son, and that the other townhouse only contained tools and equipment for work. Ms. Thomas also testified that she had a good relationship with D.T. prior to the incident.

Thomas then testified on his own behalf, and maintained that D.T.'s story was a complete fabrication. He testified that on the evening of the incident, he watched D.T.'s son while she went out with her boyfriend. D.T. brought home some movies and brought them upstairs. When Thomas went upstairs to get the movies, D.T. was already watching one and said she wanted to watch the movies upstairs. Thomas initially sat on the bed to watch the movie but was uncomfortable because D.T. was wearing undergarments and a short robe while she laid on the bed. Thomas went downstairs, and D.T. followed to ask him what was wrong. Thomas replied there was nothing wrong and followed D.T. back upstairs, where he sat on the floor to finish watching the movie.

Thomas testified that in the days following the alleged incident, his relationship with D.T. was fine, and they discussed business as usual. Thomas gave D.T. a new cell phone, but she refused to use it because she had just gotten a new

9

phone. Problems continued to arise when he required D.T. to have her phone adapted to his business and D.T. failed to comply.

In explaining the phone conversations, Thomas believed that D.T.'s mother "had put her up to something." He stated that D.T.'s mother had great influence over her and often sought to undo the progress Thomas had made in his relationship with D.T. In the first conversation, Thomas said that he had no idea what was going on; he further alleged that D.T. was seeing someone once a month for her depression prior to the incident. In the third conversation, Thomas expressed that he was growing frustrated with their conversations, continuing to believe that D.T. and her mother were up to something. He testified that he did not hear D.T. when she mentioned him licking her. Thomas stated that when he said "what happened was between us," he was referring to the lunch conversation about the will. In reference to the statement, "it was a test," Thomas denied ever "exposing her physical person." Thomas continued that he was testing D.T. with multiple things; he first wanted to see D.T.'s reaction to not being in his will, but did not explain what the other tests were.

On cross-examination, Thomas said he did not recall sending D.T. the following text message about tongue piercings:

> Tongue piercings is [sic] one of the most popular piercings. It's shocking, provocative, and fantastic for oral sex for both sexes. But at the same time, no one needs to know you have it. Janet Jackson, Keith Flint from Prodigy, Mel B from Spice Girls, and Malcolm Jamal Warner from The Cosby Show all sport pierced tongues.

Thomas further alleged the text message about him being "well endowed" was not directed at D.T., but rather was a joke between Thomas and D.T. arising from a situation in which one of Ms. Thomas's colleagues had approached him at Ms.

10

Thomas's house. Thomas acknowledged sending the text about D.T. in stilettos, but complained that it was taken out of context. Thomas further claimed the text, "I want to give it twisted baby" was a typo, and he meant to send, "Don't get it twisted, baby" instead.

Thomas denied ever commenting on or performing oral sex on D.T., further stating that he thought it was a nasty thing to do to another person. Thomas then volunteered, "Now, if she would have said I had intercourse with her, that would have been a different story." Thomas then gave an account of how D.T. had told him, in detail, about how her boyfriend had performed oral sex on her. Thomas next asserted he thought the comments about "the other night" and oral sex referred to him finding D.T. performing fellatio in the townhouse parking lot in March.

III.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, this court finds no errors patent.

IV.

## LAW AND DISCUSSION

Thomas now appeals his felony conviction and sentence pursuant to La.Const. art. 5, § 10. In asserting that no non-frivolous issues exist on which to base an appeal, Thomas's appellate attorney filed a Motion to Withdraw and accompanying brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967), and *State v. Jyles*, 96-2669 (La. 12/12/97), 704 So.2d 241. Thomas filed a pro se appellate brief with this court thereafter alleging insufficiency of the evidence

11

and an unconstitutionally excessive sentence. We will first consider Thomas's pro se allegations.

**PRO SE ASSIGNMENTS OF ERROR**:

In Thomas's pro se brief, he "respectfully requests the Court to review the record for errors patent on the face of the record and review any and all new evidence entered. In accord with such a review, the defendant asks the Court to reverse his conviction and sentence." Thomas contends there is insufficient evidence to support his conviction and asks this court to enter an order of acquittal. He additionally challenges his sentence as unconstitutionally excessive.

At the outset, this court may not "review any and all new evidence entered" as Thomas has requested. As mentioned above, the record neither reveals any errors patent on its face, nor does it indicate that any new evidence has been entered. Further, appellate courts may neither review evidence not entered into the record on appeal, nor receive any new evidence. Had there been any new evidence, review thereof would constitute the taking of evidence and thus the exercise of original jurisdiction with which we are not vested. *See* La.Const. art. 5, § 10; *and see Barber v. Testa*, 331 So.2d 139 (La.App. 3 Cir. 1976).

**Sufficiency of the Evidence**:

Thomas asserts that the evidence used to support his conviction for attempted sexual battery is insufficient. He specifically argues that "there was no video or third party witness evidence offered to confirm the allegations in this case," and maintains that the jury's verdict was based solely on "D.T's testimony that the actions occurred and the circumstantial nature of text messages and voice recordings between Thomas and D.T. in the days following the alleged incident."

12

Generally, when a sufficiency of the evidence allegation is raised on appeal, the allegation is addressed first because if the allegation has merit, a defendant could obtain an acquittal of the conviction which could render the remaining allegations of errors moot. *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970 (1981); *State v. Hearold*, 603 So.2d 731 (La.1992).

When the issue of sufficiency of evidence is raised on appeal, the reviewing court determines whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). Discretion in determinations of credibility is vested in the jury, which may accept or reject testimony within the bounds of rationality, and we will only impinge upon its discretion "to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Ryan*, 07-504, p. 2 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268, 1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727).

However, the *Jackson* standard "does not permit the reviewing court to view just the evidence most favorable to the prosecution and then to decide whether that evidence convinced it beyond a reasonable doubt." *Mussall*, 523 So.2d at 1310. "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *State v. Allen*, 36,180, p. 5 (La.App.

13

2 Cir. 9/18/02), 828 So.2d 622, 626, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004).  "Applied in cases relying on circumstantial evidence," such as the instant case where there is no direct evidence of a sexual battery other than the victim's testimony, the *Jackson* standard of review means that when a jury "'reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.'" *State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378 (quoting *State v. Captville*, 448 So.2d 676, 680 (La.1984)).

The State charged Thomas with one count of sexual battery, and the jury unanimously found Thomas guilty of the lesser included offense of attempted sexual battery.  Sexual battery is defined, in pertinent part, as "the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender" when the "offender acts without the consent of the victim."  La.R.S. 14:43.1(A)(1).  An attempt to commit a crime constitutes a separate but lesser grade of the crime intended, and occurs when: "[a]ny person who, having a specific intent to commit a crime, does . . . an act for the purpose of and tending directly toward the accomplishing of his object[.]" La.R.S. 14:27(A).  Thus, the State must prove Thomas did an act for the purpose of and tending directly toward touching D.T.'s genitals.

Though Thomas argues a lack of independent, direct evidence supporting D.T.'s testimony in asserting his innocence, "Louisiana jurisprudence has consistently held that the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even if there is no physical evidence." *State v. Simon*, 10-1111, p. 7 (La.App. 3 Cir. 4/13/11), 62 So.3d 318, 323 (quoting

*State v. Leyva-Martinez*, 07-1255, pp. 6-7 (La.App. 3 Cir. 4/30/08), 981 So.2d 276, 282, *writ denied*, 08-1200 (La. 1/30/09), 999 So.2d 747), *writ denied*, 11-8 (La. 11/4/11), 75 So.3d 922. Further, "[i]n the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion." *State v. Robinson*, 02-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79, *cert. denied*, 543 U.S. 1023, 125 S.Ct. 658 (2004).

At trial, D.T. testified that Thomas held her down, forcibly removed her underwear while she tried to fight him off, and licked her genitals, specifically, her clitoris. D.T.'s mother, Lisa Burgess, testified to these events as relayed to her by D.T. In seeking out law enforcement at her mother's behest, D.T. also shared details of the incident with both Sergeant Ashley Irby and Ms. Hammons.

Having accepted D.T.'s testimony alone as sufficient to satisfy the elements of attempted sexual battery, any rational trier of fact could have found beyond a reasonable doubt that Thomas was guilty of the sexual offense for which he was convicted. After hearing conflicting testimony from both the victim and the defendant, as well as that of several witnesses, the jury returned a unanimous guilty verdict of the lesser included offense of attempted sexual battery. Because credibility determinations are the sole province of the fact finder, the jury was free to accept D.T.'s version of the facts as more credible, and likewise reject Thomas's conflicting hypothesis of innocence advanced at trial. Accordingly, we find the evidence presented, when viewed in the light most favorable to the State, was sufficient to sustain the jury's unanimous verdict of guilt.

**<u>Excessive Sentence Review</u>**:

Thomas challenges his sentence as unconstitutionally excessive. At his sentencing hearing, the trial court sentenced Thomas to eighteen months imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. At trial, Thomas testified that he was forty-nine years old, had been continuously employed throughout his life as a productive member of society, and had no criminal record.

Louisiana Code of Criminal Procedure Article 894.1(C) requires the trial court to "state for the record the considerations taken into account and the factual basis therefor in imposing sentence." At sentencing, the trial court stated:

> The court has taken into consideration the factors that it must consider when sentencing, the factors stated in Code of Criminal Procedure Articles.

> I also take into consideration the damage done to the victim.

> The court also considers the age of the defendant.

> The court considers the age of the victim at the time.

> The court notes that - finds that Mr. Thomas has a lifelong history of being a law-abiding citizen, except for this situation here. He has been a productive member of society his entire adult life.

> And the court does note that the - I was here during this trial. I heard all of the evidence of the circumstances under which the sexual - the attempted sexual battery occurred, the circumstances surrounding that and the circumstances that followed immediately thereafter and for quite some time, and the circumstances that led up to the filing of charges.

> I note that he was not convicted of sexual battery, but attempted sexual battery. The jury - that was the jury's decision after they heard all the evidence. And I do not question the jury.

> I cannot put you on probation. The law doesn't allow it. I'm prohibited from doing so.
>
> I sentence you to serve eighteen months at hard labor.
>
> You have a period of two years from the date this sentence becomes final to assert any claim for post-conviction relief if you believe anything has been done illegally or improperly in your case.

Following imposition of sentence, the defense made a general, unsupported oral Motion to Reconsider Sentence, and the motion was denied.

The failure to include a specific basis for the Motion to Reconsider Sentence precludes a defendant from raising any objection to the sentence, including excessiveness, on appeal. La.Code Crim.P. art. 881.1(E). Though Thomas's claim is barred under La.Code Crim.P. art. 881.1, this court, in the interest of justice, will review his sentence for bare excessiveness pursuant to *State v. Graves*, 01-156 (La.App. 3 Cir. 10/3/01), 798 So.2d 1090, *writ denied*, 02-29 (La. 10/14/02), 827 So.2d 420. This court has set forth the following standard to be used in reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted) (second alteration in original).

In deciding whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has held:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted).

Under La.R.S. 14:43.1(C)(1), "[w]hoever commits the crime of sexual battery shall be punished by imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than ten years." The application of the attempt statute adjusts the penalty range to zero to five years, with or without hard labor, and without benefit of probation, parole, or suspension of sentence: "In all other cases he shall be . . . imprisoned . . . in the same manner as for the offense attempted; such . . . imprisonment shall not exceed one-half of the . . . longest term of imprisonment prescribed for the offense so attempted[.]" La.R.S. 14:27(D)(3).

In *State v. Collins*, 44,248, p. 23 (La.App. 2 Cir. 5/27/09), 12 So.3d 1069, 1084, the second circuit found the maximum sentence of five years for a conviction of attempted sexual battery was not excessive:

> The record does not show that the defendant's sentence is grossly out of proportion with the acts committed. With regard to the attempted sexual battery conviction, the defendant was sentenced to the maximum of 5 years at hard labor without benefit of probation, parole or suspension. The defendant was originally charged with sexual battery and faced a 10-year sentence, and although he was only convicted of attempted sexual battery, the defendant has not shown that this was a "purposeless and needless inflection of pain and suffering."

The defendant in *Collins* had both aggravating and mitigating factors not present in the instant case. Here, however, "the trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1[;] the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983).

As required by La.Code Crim.P. art. 894.1, the sentencing transcript reflects that the trial court stated the considerations taken into account and the factual bases for imposing the eighteen-month sentence. Thomas received a sentence of one and one-half years at hard labor, which is less than one-third of the maximum possible penalty of five years. Additionally, we note that Thomas was originally charged with sexual battery, and thus received a significant benefit from the jury's verdict convicting him of the lesser included offense of attempted sexual battery. Therefore, Thomas's eighteen-month sentence is not so grossly disproportionate to the severity of the crime that it is shocking, fails to meaningfully contribute to acceptable penal goals, or constitutes a needless imposition of pain and suffering.

19

As such, this court finds no manifest abuse of the sentencing court's wide discretion in determining an appropriate penalty in the instant case.

**ASSIGNMENT OF ERROR**:

After asserting that a thorough review of the record reveals no non-frivolous issues, appellate counsel for Thomas asks this court to review the record for errors patent that may reverse Thomas's conviction and sentence, and also requests that this court grant the attached Motion to Withdraw as directed by *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967), and *State v. Jyles*, 96-2669 (La. 12/12/97), 704 So.2d 241.

In *State v. Benjamin*, 573 So.2d 528, 531 (La.App. 4 Cir. 1990), the fourth circuit explained the *Anders* analysis:

> When appointed counsel has filed a brief indicating that no non-frivolous issues and no ruling arguably supporting an appeal were found after a conscientious review of the record, *Anders* requires that counsel move to withdraw. This motion will not be acted on until this court performs a thorough independent review of the record after providing the appellant an opportunity to file a brief in his or her own behalf. This court's review of the record will consist of (1) a review of the bill of information or indictment to insure the defendant was properly charged; (2) a review of all minute entries to insure the defendant was present at all crucial stages of the proceedings, the jury composition and verdict were correct and the sentence is legal; (3) a review of all pleadings in the record; (4) a review of the jury sheets; and (5) a review of all transcripts to determine if any ruling provides an arguable basis for appeal. Under C.Cr. P. art. 914.1(D) this Court will order that the appeal record be supplemented with pleadings, minute entries and transcripts when the record filed in this Court is not sufficient to perform this review.

The Louisiana Supreme Court approved the fourth circuit's analysis in *State v. Mouton*, 95-981 (La. 4/28/95), 653 So.2d 1176, and, again, in *Jyles*, 704 So.2d 241.

As noted above, the record reveals no errors patent on its face. While counsel concedes that the trial court made the following errors, he contends that such errors were either harmless, or inured to the benefit of the defendant. First, counsel explains that, upon examination of the record, he believes the trial court made an error in ruling on a *Batson* objection by the defense during voir dire, but that such error was harmless. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986). Next, noting that the trial court may have erred in its evidentiary rulings on some of the defense's objections, counsel again asserts that any such error was harmless. Last, counsel reveals that there was an error in the jury instructions regarding whether sexual battery was a general or specific intent crime, but that such error was in Thomas's favor.

Counsel further states that he has reviewed the sufficiency of the evidence presented at trial, and that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Counsel also reviewed Thomas's sentence and concluded that since it was one-third of the maximum possible sentence for the offense, and because neither probation nor suspension of sentence is allowed for this conviction, the sentence imposed was not excessive.

### *Batson* Objection at Voir Dire:

Appellate counsel asserts that the trial court erred in its analysis following trial counsel's *Batson* challenge at voir dire. Nevertheless, appellate counsel believes the error was harmless because the trial court's ruling established that the State at least provided sufficient race-neutral reasons for striking the

potential juror, regardless of whether the defense made out a prima facie case of purposeful discrimination.

During voir dire, defense counsel raised a constitutional *Batson* challenge after the State exercised its first peremptory strike against Mr. Worick, a black male juror. Prior to either side exercising peremptory challenges, both the prosecution and the defense agreed to jointly strike Ms. Knatt, a black female, for cause, as both sides believed that she showed prejudice. After Ms. Knatt was removed, Mr. Worick was the only remaining black member of the potential jury panel. The State used its first peremptory strike against Mr. Worick, and then struck two white females thereafter, Ms. Hebert and Ms. LeBlanc.

In *Batson v. Kentucky*, 476 U.S. 79, the United States Supreme Court held that the use of peremptory challenges to exclude persons from a jury based on their race violates the Equal Protection Clause. The jurisprudence regarding *Batson* is well-settled in Louisiana:

> A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensive reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Alex v. Rayne Concrete Serv.*, 05-1457, 05-2344, 05-2520, p. 15 (La. 1/26/07), 951 So.2d 138, 150-51 (quoting *State v. Snyder*, 98-1078 (La. 9/6/06), 942 So.2d 484).

In discussing the first *Batson* criterion, the United States Supreme Court has explained that "a prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 169, 125 S.Ct. 2410, 2416 (2005) (footnote omitted) (quoting *Batson*, 476 U.S. at 96). The court further explained:

> "To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race."

*Id*. (quoting *Batson*, 476 U.S. at 96). Therefore, "a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170.

The defense objected to the peremptory strike against Mr. Worick by stating that Mr. Worick was black, and that "[h]e didn't say anything adverse at all to the State's case." Before the trial court was able to rule on whether the defense made out its prima facie case of purposeful discrimination, the prosecution interjected to assert that the defense must first show a "pattern," and that it was "impossible to show a pattern when there were only two African Americans on the

eighteen and one was challenged for cause, joint cause." The prosecution further

insisted that the defense "ha[s] to show a pattern first" in order to establish a prima

facie case, to which the defense replied that "[t]he pattern is that the only black was

challenged."[2]

The trial court then announced that it was going to hold a *Batson*

hearing and that the State was "going to have [to] show some non-biased reason for

challenging him." After reading aloud La.Code Crim.P. art. 795(C), the trial court

asked the defense to once again state its objection. The defense responded that Mr.

Worick was "only challenged because of his race," and that "there was nothing stated

in any questioning to elicit a challenge for him" besides his race. The following

colloquy took place:

> BY THE COURT:
>
> Okay. All right. Defense, with regard to response,
> with regard to whether or not a prima facie case supporting
> that the objection is made by the objecting party that it was
> - that prospective juror, Mr. Steven Worick, was removed

---

[2]We note that appellate counsel correctly states in his brief that both the trial court and the State were wrong to presume that a "pattern" is the only way to establish a prima facie showing of purposeful discrimination. The Supreme Court made clear in *Batson* itself that "pattern" was but one example of establishing a prima facie case:

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. **For example**, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. **These examples are merely illustrative**.

*Batson*, 476 U.S. at 96-97 (emphasis added).

In overruling *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824 (1965), a prerequisite showing of a "pattern" of discriminatory strikes was specifically rejected by *Batson*. Indeed, "[f]or evidentiary requirements to dictate that 'several must suffer discrimination' before one could object, *McCray v. New York*, 461 U.S., at 965, 103 S.Ct., at 2440 (MARSHALL, J., dissenting from denial of certiorari), would be inconsistent with the promise of equal protection to all." *Batson*, 476 U.S. at 95-6. Therefore, this court finds that while showing a pattern would have been sufficient in order to establish a prima facie case of purposeful discrimination, it was not necessary for the defense to do so as the State so insisted.

by the state solely because of his race, has that been made, the prima facie case?

BY MS. CHARRIER [STATE]:

Your Honor, Number One, I don't think Mr. Burton has shown a prima facie case indicating that this is a pattern of striking jurors, which is the first requirement, that he showed that it is a pattern. It's not a pattern.

Number One, the state - that was the very first challenge the state used. I don't know how that could be a pattern, in and of itself, when only one challenge has been used.

Secondly, the state did use two additional challenges, peremptory challenges, and those were on two white females. So it's not a pattern.

There were only two African Americans on this particular panel. One was excluded for cause by both myself and Mr. Burton, leaving Mr. Worick.

I do have notes indicating my reasons for using the peremptory challenge on Mr. Worick.

He had indicated that an allegation of a sex crime is an easy allegation to make. He in fact told us about a friend that he had that was accused of this particular sort of crime and found out later that it wasn't true at all. So, for that reason, he thinks that anybody can pretty much make this allegation.

He also indicated that a victim should call 9-1-1 immediately after this sort of crime happens.

There were also several occasions where I specifically called Mr. Worick by name to answer questions, and he wasn't necessarily listening to me[,] and I had to repeat the question several times. So[,] I'm not sure that he was paying attention throughout the process.

That's it, Your Honor.

BY THE COURT:

So[,] you gave me some race-neutral reasons for -

. . . .

- for excluding him.

Mr. Burton?

BY MR. BURTON [DEFENSE]:

As far as the issue of a pattern, Your Honor, there was one black, the only black that was on the jury, and that black was eliminated by the state. And that, in and of itself, is a pattern. It's not the fact of the matter after that there was no other blacks eliminated, because there was no other blacks on the jury to eliminate. So[,] I believe the pattern has been established.

And as far as - the state didn't inquire if he wasn't paying attention, because he answered all of the questions asked of him.

And also he did say, when asked about the 9-1-1, that they should but they might have been scared. So[,] he gave a reason why they might not, and that's what she had asked. He answered the question.

So[,] we believe that the basis is the race of the defendant.

BY THE COURT:

Okay. Well, it's not obvious from the voir dire by the state that her reasons for excluding him are based on race at all.

Probably, you made a mistake of fact. And I'm going to go ahead and correct that for the record.

The first juror, Dana Knatt . . . she is also an African American on the jury, okay? So[,] you had two of them. And you had challenged her for cause, and the state had challenged her for cause, okay? And both of your reasons were non-race related, okay?

. . . .

So[,] there was more than one juror on there.

BY MR. BURTON:

I didn't count Miss Knatt, Your Honor, just for the record, because of the fact we both had cause that she

26

wasn't - she stated cause of her own. This was a non-cause, and that's why I stated it like that.

BY THE COURT:

Okay. So[,] he was the only one remaining for peremptory challenges.

. . . .

Okay. He certainly wasn't - yet, the state has given non-race related reasons and basis for that. And I believe them.

Let me tell you something. If I even smelled it, I'd jump on it, okay? And I don't smell it, okay? It [the *Batson* objection] doesn't pass the smell test with me here, okay? I think he was removed for non-race related reasons.

And so your motion is denied.

As illustrated above, the trial court made a number of errors with respect to its *Batson* analysis. After the defense twice asserted its *Batson* challenge, the trial court failed to definitively rule on whether a prima facie case was established. Instead, the trial court appeared to shift the burden to the State to offer race-neutral reasons for striking Mr. Worick, which would be consistent with the second inquiry of a *Batson* analysis. In doing so, however, the trial court improperly asked the State whether it believed the defense made out a prima facie case, after which the State began to offer race-neutral reasons for challenging Mr. Worick. This court notes that it is the trial judge's prerogative alone to draw his own inferences in determining whether the defense established a prima facie case of discrimination, and certainly not that of the State.

Despite the trial court's misguided *Batson* analysis, the Louisiana Supreme Court has held that:

A trial judge may . . . effectively collapse the first two stages of the *Batson* procedure, whether or not the

> defendant established a prima facie case of purposeful discrimination, and may then perform the critical third step of weighing the defendant's proof and the prosecutor's race-neutral reasons to determine discriminatory intent." *State v. Jacobs*, 99-0991, p. 8 (La. 5/15/01), 803 So.2d 933, 941 [, cert. denied, 534 U.S. 1087, 122 S.Ct. 826 (2002)].

*State v. Broussard*, 16-1836, p. 4 (La. 1/30/18), __ So.3d __. Further, "[a]lthough there may be 'any number of bases on which a prosecutor reasonably [might] believe that it is desirable to strike a juror who is not excusable for cause . . ., the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challeng[e].'" *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S.Ct. 2317, 2324 (2005) (quoting *Batson*, 476 U.S. at 98, n.20, 106 S.Ct. 1724).

Among the reasons the State gave for challenging Mr. Worick was the potential juror's indication of possible partiality in favor of Thomas and bias against the State's case. Mr. Worick had a friend who had been falsely accused of a sex crime and thought, therefore, false allegations of sexual impropriety were easy to make. The potential juror further believed that true allegations would be indicated by a call to emergency services immediately following the offense. Moreover, Mr. Worick seemed disinterested in listening to the prosecutor during questioning.

In overruling the *Batson* objection, the trial court expressly found the prosecutor's race-neutral reasons believable and, implicitly, reasonable. Though we note that the defense was permitted to employ a wide variety of evidence in establishing a prima facie case without the need to show a "pattern," the trial court nevertheless stated reasons for ruling that satisfies *Batson's* third and final inquiry:

> BY THE COURT:
>
> Defense could not have made a prima facie case, because it was the only person there and the state - there was no evidence to support a prima facie case.

> Okay. There was just none available. If we'd have
> had more African Americans of the jury, then I could have
> made that assessment, okay? I don't see - there's just not
> enough to go on to help this fact-finder. So[,] no prima
> facie case was made. Even if one was made, then the state
> has articulated believable reasons for removing him which
> are non-race related.

Unless clearly erroneous, the trial court's ruling on the issue of discriminatory intent must be sustained where "determinations of credibility and demeanor lie 'peculiarly within a trial judge's province.'" *Snyder v. Louisiana*, 552 U.S. 472, 476, 128 S.Ct. 1203, 1208 (2008) (quoting *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859 (1991)). In ruling that "no prima facie case was made," the trial court evaluated and accepted the State's race-neutral justifications in determining that the defense had not carried its ultimate burden of persuasion.

Therefore, in the absence of exceptional circumstances, this court must defer to the trial court's determination, and likewise finds that such a determination was not clearly erroneous.

**<u>Motion in Limine and Objection Regarding Text Message Transcript</u>:**

Prior to trial, the trial court conducted a hearing on a motion in limine filed by the defense seeking to have text messages between Thomas and D.T. made before the incident excluded on grounds that they were not res gestae. The trial court initially denied relief on grounds that the messages showed the development of D.T.'s relationship with Thomas.

At trial, the defense objected to the introduction of a transcript of the same text messages, identified as State's Exhibit Number 1, by asserting a lack of proper foundation and challenging the admissibility of hearsay evidence. Though

29

the trial court sustained Thomas's objection, it ultimately allowed the introduction of State's Exhibit Number 2, a download of the information from D.T.'s cellular phone containing the same information. However, because the State failed to publish that exhibit to the jury, this court finds that there was no prejudice arising from the trial court's initial denial of Thomas's motion in limine.

**Thomas's Evidentiary Objections at Trial:**

During trial, the defense made a number of objections to evidence being introduced at trial. In reviewing the record, appellate counsel asserts that any errors made with respect to the evidentiary rulings were harmless and did not prejudice any substantial rights of the defendant. Such rulings focused on D.T. seeing a therapist, her current state of mind regarding pre-incident text messages received from Thomas, relevance and hearsay objections to Ms. Burgess's testimony, admission of State's Exhibit Number 3, and Thomas's cross-examination.

This court has held:

> Absent clear abuse, we will not intrude on the broad discretion of a trial court in evidentiary decisions. It is within the trial court's province to determine the potential for prejudice afforded by certain evidence and testimony and the degree to which such prejudice might exceed probative value and taint the jury verdict.

*Nugent v. Cont'l Cas. Co.*, 634 So.2d 406, 408 (La.App. 3 Cir. 1994). Further, error may not be predicated upon an evidentiary ruling unless it affects a substantial right of the defendant. La.Code Evid. art. 103(A).

Our review of the record shows no reversible error arising from the trial court's evidentiary rulings.

## Jury Instructions:

Appellate counsel asserts that though the trial court erred in instructing the jury that sexual battery is a specific intent crime, such error inured to Thomas's benefit. Though defense counsel acknowledged the error in Thomas's favor, neither party initially objected to the jury instructions as given. The State objected as the trial court informed the panel that sexual battery is a specific intent crime, but the defense maintained it was a specific intent crime. The trial court ruled that sexual battery was a specific intent crime because the offender had to intend to touch the victim's genitals.

In *State v. Cage*, 583 So.2d 1125 (La.1991), *cert. denied*, 502 U.S. 874, 112 S.Ct. 211 (1991), the Louisiana Supreme Court stated that an improper jury instruction is a trial error and is subject to a harmless error analysis.

This court has consistently held sexual battery to be a general intent crime. *State v. Bourque*, 09-1092 (La.App. 3 Cir. 4/7/10), 33 So.3d 1092 (citing *State v. Stevenson*, 05-52 (La.App. 5 Cir. 6/28/05), 908 So.2d 48, *writ denied*, 05-2592 (La. 6/2/06), 929 So.2d 1247), *writ denied*, 10-1062 (La. 12/10/10), 51 So.3d 722. While attempted sexual battery requires a defendant to act with specific intent pursuant to La.R.S. 14:27(A), Thomas was charged with one count of sexual battery, which requires only a showing of general intent. *See* La.R.S. 14:43.1.

As appellate counsel correctly notes, the error in the jury instructions was in Thomas's favor since it increased the State's burden in proving he acted with specific intent, when it only needed to show that he acted with general intent in order to convict Thomas of sexual battery. Therefore, the error in the jury instruction cannot be said to prejudice a substantial right of Thomas, and thus constitutes harmless error.

31

V.

## <u>CONCLUSION</u>

Pursuant to *Anders* and *Benjamin*, this court has performed an independent, thorough review of the record, including pleadings, minute entries, charging instrument, and transcripts. The State properly charged Thomas via bill of information signed by an assistant district attorney with one count of sexual battery. Thomas was present at and represented by counsel at all crucial stages of the proceedings. A jury unanimously convicted Thomas of attempted sexual battery, a lesser included offense. The trial court subsequently sentenced Thomas to serve eighteen months at hard labor without benefit of probation, parole, and suspension of sentence. The jury verdict and Thomas's sentence are legal in all respects. This court finds no non-frivolous issue that would support Thomas's appeal. Based on the foregoing, this court concludes that appellate counsel has demonstrated he performed a thorough review of the record and found no non-frivolous issues.

Accordingly, this court affirms Thomas's conviction and sentence and grants appellate counsel's motion to withdraw.

**AFFIRMED. MOTION TO WITHDRAW GRANTED.**