NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-141

STATE OF LOUISIANA

VERSUS

ANTHONY TEXADA

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2022-CR-229,924-B
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

LEDRICKA J. THIERRY
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Chief Judge, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.

AFFIRMED.

**Hon. Charles A. Riddle, III**
**Anthony F. Salario**
**Andrea Ducote Aymond**
**Post Office Box 1200**
**Marksville, LA   71351**
**(318) 240-7123**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Paula C. Marx**
**Louisiana Appellate Project**
**P.O. Box 82389**
**Lafayette, LA       70598**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Jason Lee Lopez**

**THIERRY, Judge.**

Defendant, Anthony Texada, was found guilty of violating La.R.S. 14:43(4) for vaginally and/or anally raping A.B. when she was unable to and/or failed to give consent.[1] Defendant was sentenced to twenty-five years at hard labor without benefit of probation, parole, or suspension of sentence. Defendant now appeals, asserting the following assignments of error: 1) the evidence is insufficient to support his conviction; and 2) the testimony of Detective Greer was not admissible pursuant to La.Code Evid. art. 801(D)(1)(d). For the reasons discussed below, we affirm Defendant's conviction.

## FACTS:

On November 2, 2021, Detective Gary Greer received a complaint from A.B.'s mother that Defendant, Anthony Texada, raped A.B. At the time of the crime, A.B. was nineteen years old and according to Detective Greer, was not "at the mental status of a nineteen year old." A.B. had a history of schizophrenia and had special education as a child.

Defendant was charged by indictment filed on January 20, 2022 with third degree rape, a violation of La.R.S. 14:43, in that he vaginally and anally raped A.B. when she was incapable of resisting or understanding the nature of the act by reason of stupor or abnormal condition when the offender knew of A.B.'s intoxication and/or unsoundness of mind. The indictment was amended on September 13, 2022 to charge Defendant with committing the offense under La.R.S. 14:43(4) in that he vaginally and/or anally raped A.B. when she was unable to and/or failed to give consent.

The trial in this matter commenced on September 13, 2022, and Defendant was found guilty by a unanimous jury the following day. On October 25, 2022,

---

[1]The initials of the victim are used in accordance with La.R.S. 46:1844(W).

Defendant was sentenced to twenty-five years at hard labor without benefit of probation, parole, or suspension of sentence. A "Notice of Appeal with Designation of Record and Motion to Appoint Appellate Counsel" was filed on October 27, 2022.

Defendant appeals, alleging two assignments of error on appeal:

## ASSIGNMENTS OF ERROR

1. The evidence is insufficient to support the guilty verdict of third degree rape beyond a reasonable doubt as the State failed to prove a rape occurred. There was no physical evidence to support the charge. The adult complainant did not testify at trial that she was raped; her trial testimony was vague and internally inconsistent and contradictory to her forensic interview at the Children's Advocacy Center, as well as her pre-trial complaint of a rape. The conviction and sentence should be vacated accordingly.

2. The hearsay testimony of Detective Greer describing A.B.'s complaint of rape was not an initial report and was inconsistent with A.B.'s trial testimony; therefore, not admissible pursuant to La. Code of Evid. art 801(D)(1)(d). The trial court erred in allowing this inadmissible hearsay to be presented to the jury.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

**ASSIGNMENT OF ERROR NO. 1:**

In his first assignment of error, Defendant contends the evidence is insufficient to support the guilty verdict of third degree rape beyond a reasonable doubt, as the State failed to prove a rape occurred. Defendant suggests there was no physical evidence to support the charge. Additionally, the victim did not testify at trial that she was raped. Defendant suggests the victim's trial testimony was vague, internally inconsistent, and contradictory to her forensic interview at the Children's Advocacy Center (CAC) as well as her pre-trial complaint of rape. Thus, his conviction and sentence should be vacated.

2

When the issue of sufficiency of evidence is raised on appeal, the reviewing court determines whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). Discretion in determinations of credibility is vested in the jury, which may accept or reject testimony within the bounds of rationality, and we will only impinge upon its discretion "to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Ryan*, 07-504, p. 2 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268, 1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727).

. . . .

. . . "Louisiana jurisprudence has consistently held that the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even if there is no physical evidence." *State v. Simon*, 10-1111, p. 7 (La.App. 3 Cir. 4/13/11), 62 So.3d 318, 323 (quoting *State v. Leyva-Martinez*, 07-1255, pp. 6-7 (La.App. 3 Cir. 4/30/08), 981 So.2d 276, 282, *writ denied*, 08-1200 (La. 1/30/09), 999 So.2d 747), *writ denied*, 11-1008 (La. 11/4/11), 75 So.3d 922. Further, "[i]n the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion." *State v. Robinson*, 02-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79, *cert. denied*, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004).

*State v. Thomas*, 17-959, pp. 13–15 (La.App. 3 Cir. 9/26/18), 255 So.3d 1189, 1199–1200, *writ denied*, 18-1757 (La. 4/22/19), 268 So.3d 294, *and writ denied*, 18-1662 (La. 4/22/19), 268 So.3d 303.

At the time of the offense, La.R.S. 14:41 defined rape as:[2]

A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.

B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.

Louisiana Revised Statutes 14:43 defines third degree rape, in relevant part, as:

---

[2]The offense date is November 2, 2021.

3

A. Third degree rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:

. . . .

(4) When the offender acts without the consent of the victim.

Detective Gary Greer was the State's first witness. He received a complaint on November 2, 2021 from A.B.'s mother. He first spoke to A.B.'s mother then to A.B. He ascertained from A.B.'s mother that A.B. had been raped by Defendant, A.B.'s mother's boyfriend. A.B. subsequently informed Detective Greer of the following:

She said that Anthony was giving her alcoholic beverages, that she [sic] while they were in the vehicle he continued to touch her, saying that he would like to touch her more, see more of her body. When they got to the house that he pulled her panties down and he inserted his penis and he did ejaculate.

To Detective Greer's knowledge, this did not happen more than one time or in more than one location on that day.

According to Detective Greer, A.B., who was nineteen, was distraught and confused. Detective Greer was not able to tell if A.B. was under the influence of any substances and did not recall her smelling like alcohol.

The victim's mother told Detective Greer that A.B. was schizophrenic, and Detective Greer testified that he could tell A.B. was not "at the mental status of a nineteen year old." Thus, after setting up an evaluation for A.B. with a sexual assault nurse examiner (SANE), he set up an interview for A.B. at the advocacy center.

According to Detective Greer, the details given by A.B. during the CAC interview were the same as those she reported to him. Additionally, each account given by A.B. was consistent. Detective Greer testified that when someone is very detailed, that person has a "very clear recollection of what . . . happened."

4

Detective Greer was not given the time that the offense occurred. However, he went to the home at approximately 6:00 p.m., and records indicated A.B. went for the sexual assault examination at 9:00 p.m. A.B. had not showered prior to the exam.

Detective Greer was questioned on cross-examination as follows:

Q. Did you indicate in your report whether [A.B.] said that she did not consent to anything that happened that day with Mr. Texada?

. . . .

A. I didn't put those words in there, sir.

Q. If you thought a rape occurred, wouldn't you think that would be the most important thing to put in your report?

A. Yes, sir.

On re-direct, the State asked:

Q. If [A.B.] had consented to the acts that happened would we even be here today?

A. No.

Dejuana Juneau, a SANE nurse, was accepted as an expert. Nurse Juneau testified that evidence was collected at 8:45 p.m., with the event occurring earlier that day at noon. A.B. reported a history of schizophrenia and being in special education as a child. Nurse Juneau testified she knew A.B. was nineteen, but "mentally she felt … we just needed to take things a little slower." A.B. denied having previously had sexual intercourse. A.B. indicated there had been vaginal penetration and ejaculation. Nurse Juneau "would think there would be [DNA] if there was ejaculation." She additionally felt "like especially after nine hours that gravity the DNA would start to come out." Furthermore, A.B. had gone to the restroom several times and could have wiped away evidence. According to Nurse Juneau, the absence of semen did not determine whether a rape had occurred.

Nurse Juneau was questioned about consent as follows:

5

Q. Did ... in taking the oral history of [A.B.] was it your impression as a SANE nurse that he [sic] conceded to any sexual activity with the defendant?

A. No.

Q. Was it your understanding as an expert qualified in the area of SANE nursing that whatever sexual encounter she had with this man, the defendant, was not consented to?

A. Correct.

On cross-examination, Nurse Juneau was questioned as follows:

Q. All right. And did she indicate where the ejaculation supposedly occurred?

A. On our forms as we ask the questions do you want me to read that as it says it?

Q. Uh...

A[.] Where it says penis and then it just says ... it says penetration of female sexual organs and it says yes.

Q. Yes.

A. And then penis and then it has ejaculation yes. And then also down that [sic] it says penetration of anus and it says yes with a penis and yes ejaculation.

Q. So does that indicate to you that he ejaculated in both spots or ... what does that indicate to you?

A. I mean this is her history and this is that she said he ejaculated.

Q. O.K. So that's not really an indication of her telling you yes he ejaculated in my vagina or yes he ejaculated in my anus, that's not what that is?

A. Not on that.

Q. O.K.

A. That's not her ...

Q. Did she indicate where ... to you besides on these ... this check list where he ejaculated at?

A. On part of her history she says his penis was inside of me.

Q. But that doesn't indicate at that point where?

6

A.      No it does not.

On November 8, 2021, A.B. was interviewed at the CAC due to her cognitive delay. The video of the CAC interview was introduced as Exhibit S-1 and the transcript thereof as Exhibit S-3. During that interview, A.B. said Defendant told her she was beautiful, kept asking her to go to the store, and gave her alcohol. She then stated:

> At first we went in the . . . couch where the living room is and then he took his male part out and then he, he put it in my butt. He put it in there. I didn't even know what he was doing . . . . And then . . . we sat that [sic] back down and then we went in the kitchen and he lift me up on the washer. He lift me all the way up on the washer and he put his male part all the way in there (gestures) and he squirt his sperm into, into my butthole. He squirt his sperm into it and it feel like he was at my personal area. And he was right there, he was right there and he, he, he, was right there in my personal area so he uh, yeah he had, yeah he had uh, yeah he was right there and, and I felt kind of weird and, and, and I told my sister, I told my sister, she was like what?

A.B. also stated Defendant rubbed her chest. She further reported that she was on the couch when Defendant told her to stand up. "I pulled my underwear down and . . . he put it all the way in there, he told me to bend over and, and, and then, and then when I stood back up, he kept like stroking me and stuff." A.B. said Defendant "had his middle part, he was (gestures), he was making all . . . weird sounds . . . ." A.B. then indicated Defendant took out his male part and put it all the way inside her "butthole," which felt weird. When asked if Defendant said anything while his male part was in her "butthole," A.B. replied: "No, he was tellin' me to shush (gestures) and my, uh, my mom said when my mom said uh she uh went and uh he, he came back in there and she said that he kept going back and forth, going back and forth, back and forth in there." She felt something "liquidy. It was his sperm." She felt this on her "butthole." Defendant did this on the sofa, on the washer, and in the living room. A.B. said that on the wall, Defendant "kept scooting me back on his male part to try to hit, was tryin' to hit my butt and everything, kept

7

tryin' to hit my butt and stuff." A.B. did not say anything to Defendant because she was in shock.

The victim's mother testified that in November 2021, Defendant lived in her home. A.B.'s mother said A.B. had been in special education and had been diagnosed with schizophrenia when she was sixteen. A.B.'s mother described A.B. as "[j]ust totally different" and "kind of like a child." A.B.'s mother testified that as a result of her schizophrenia, A.B. did weird things like put Clorox in the refrigerator. Additionally, A.B.'s mother had to "remind her of things and what things are. And I've got to remind her and teach her everything over and everything I've ever taught her. Because . . . she's going to forget it." When asked if A.B. knew the difference between the truth and a lie, A.B.'s mother responded, "Sometimes I think she does, sometimes she doesn't."

According to A.B.'s mother, A.B. had not been sexually active. Additionally, A.B. did not drink and did not appear intoxicated when she reported the incident at issue to A.B.'s mother. However, Defendant was drinking that day.

A.B. was not taking her medication for schizophrenia during the time at issue. A.B.'s mother was asked to describe how A.B. behaved differently without her medication:

> She's just you know did little things that just kind of get on your nerves a little bit. Just kind of annoying little things, it wasn't nothing to hurt anybody. But sometimes she got on the stove and I told her not to get on the stove because I wasn't sure whether it was a good idea for her to get on the stove you know being schizophrenic[.]

A.B.'s mother signed a dismissal of the charges at issue because she was in denial since she had been dating Defendant for five years. A.B.'s mother also texted Defendant's mother about a month after the incident, stating she made a mistake and the allegations were not true. She also put money in Defendant's account while he was incarcerated. According to A.B.'s mother, she had asked Defendant to leave

her residence for two years.  A.B.'s mother further testified that A.B. never recanted, and she believed Defendant assaulted A.B. because A.B. said he did.  Moreover, A.B. "didn't lie on people."

Sarena Brown, the victim's sister, testified that when she returned home from school on the day at issue, A.B. told her Defendant had sex with her.

A.B. testified at trial.  A.B. remembered something unusual happening with Defendant, and nothing like that had ever happened to her before.  A.B. indicated she knew what sex and private parts were.  A.B. was further questioned as follows:

Q. Did Mr. Anthony ever touch your private parts?

A. No, ma'am.

Q. Has he ... did he on that day we're talking about touch your private parts with some part of his body? You understand ... you want me to ask it better, ask you a better question?

A. Yeah.

Q. On the day we're talking about did Mr. Anthony use any of his private parts to touch any of your body?

A. NO VERBAL RESPONSE...

Q. Take your time.

A. What did you say?

Q. So, did Mr. Anthony on the day we're talking about did he use ... did his private parts touch any area of  your body?

A. No, ma'am, yes, ma'am.

Q. Is it yes or no?

A. No.

Q. Did Mr. Anthony on that day his [sic] private parts touch your body?

A. Yes, ma'am.

Questioning of A.B. continued:

9

Q.     At some point you said Mr. Anthony [sic] private parts touched your body. Do you remember where you were when that first happened?

A.     No. In my front living room.

Q.     [T]he front living room?

A.     Yes.

Q.     How did it happen? What did he do, tell us about it as much as you can. Are you nervous?

A.     A little bit.

Q.     Just tell us what you can remember about how his private parts came to touch your body.

A.     NO VERBAL RESPONSE...

Q.     Do you remember anything about that day, do you remember anything about that day?

A.     Not ... wait, what were you asking me?

Q.     What happened that day? How about this, why don't you just tell me in your own words what happened?

A.     O.K. All I remember ...

Q.     Do you remember what you were wearing?

A.     Not really.

Q.     Do you know if you were wearing ... when his private parts touched your body, did ... what part of our [sic] body?

A.     Back side.

Q.     Back side, you're talking about your butt?

A.     Yes.

Q.     Were your panties, did you have panties on?

A.     NO VERBAL RESPONSE.

[Q].   Were they pulled up or were they pulled down?

A.     [T]hey were pulled up.  They were already pulled up.

Q.     Had they been pulled down at some point?

10

A.     Yes, ma'am.

Q.     How were they pulled? Did you do it or did Mr. Anthony do it?

A.     NO RESPONSE...

Q.     But they got pulled up?

A.     Um hum.

         BY THE COURT:

              That's a yes?

A.     Yeah.

BY MS. AYMOND

Q.     Did you want to have sex with Mr. Anthony?

A.     NO VERBAL RESPONSE...

         BY THE COURT:

              That's a no? When you shaking your
head
              what does that mean?

A.     No.

BY MS. AYMOND

Q.     But did he try to have sex with you?

A.     I don't know. No. I don't ...

Q.     Is there anything [A.B.], about that day that you remember about Mr. Anthony touching anything ... you can tell us.

A.     It was just a bad ...

Q.     What part of his body touched your back side?

A.     The down side, the down side, the back side.

Q.     Your back side?

A.     My back side.

Q.     What did he use to touch your back side with?

11

A.	What did he use?

Q.	Yeah what part of his body did he use to touch your back side?

A.	I don't know ...

	. . . .

Q.	What ... do you know what our private parts are?

A.	Yes, ma'am.

Q.	What do you call a man's private part?

	. . . .

A.	Uh... oh... I don't know.

Q.	So did something happen that day with Mr. Anthony and you?

A.	Did something happen with Mr. Anthony that you told your mom about?

A.	Yes, ma'am.

Q.	Do you ... can you tell us what you told your mom what happened that day?

A.	 I told my ... and I told my mother and she ... she ... she...

Q.	What's that?

A.	I went and I told my mom.

Defendant gave A.B. alcohol that day, and he was acting weird.  A.B. denied Defendant told her anything about being pretty or beautiful.  A.B. indicated that what she reported to her sister, mother, and the nurse was the truth.  A.B. was further questioned:

Q.	O.K. [A.B.], did Mr. Anthony do anything weird to you?

A.	No.

Q.	 Had anything like what happened on that day ever happen to you before?

A.	Yes, ma'am.

Q.	With Mr. Anthony, with whom, I'm sorry.

12

A.    Wait, what did you say?

Q.    Has everyone you talked to whenever this happened, did you tell the truth?

A.    Yes, ma'am.

Detective Chad Jeansonne testified that in 2007 he received a complaint from Defendant's seventeen-year-old stepdaughter that Defendant engaged in sexual acts with her for several years when she was a minor. As a result thereof, Defendant was arrested and charged.

Milton Alexander, a former probation and parole officer, supervised sex offenders, including Defendant. He testified that Defendant was convicted of molestation of a juvenile on September 8, 2008.[3]

Defendant contends A.B.'s statements during the CAC interview provided details of an alleged rape, but her trial testimony indicated there was only touching of her "butt." Defendant notes that A.B.'s testimony was inconsistent regarding what touched her "butt," but at one point she indicated Defendant touched her "butt" with his private part. However, touching of the "butt" with a private part is not penile penetration for purposes of La.R.S. 14:43. Defendant points out there was no confirmation that a rape occurred via medical exam.[4] Defendant additionally notes that A.B. has schizophrenia and was off her medication at the time of the event. Based on the conflict between the CAC statements and trial testimony, Defendant suggests there are such internal contradictions and irreconcilable conflicts with the physical evidence that there is reasonable doubt in this case.[5] Defendant then notes

_____

[3]The jury was instructed that evidence of Defendant's prior offense was introduced in an attempt to show a pattern.

[4]Defendant asserts there was no DNA in the sexual assault kit, citing to an email from a forensic DNA analyst. However, that email was not entered into evidence at Defendant's trial. Nevertheless, there was no testimony regarding DNA test results.

[5]Nurse Juneau did not testify as to any physical injuries suffered by A.B.

(continued…)

13

that the CAC interview indicated Defendant told A.B. she had pretty legs but at trial she denied this occurred. Moreover, at trial, A.B. denied Defendant tried to have sex with her, and she testified he did not do anything weird to her. However, in her CAC interview, A.B. said she was raped.

Defendant also addresses A.B.'s mother's testimony. He notes that A.B.'s mother believed A.B., denied believing her, texted Defendant's mother stating the event did not happen, deposited money in Defendant's prison account, and testified she believed A.B. was raped.[6]

The State argues it proved penetration occurred through all the witnesses it presented. It contends A.B. gave consistent accounts of the rape to her sister, Detective Greer, Nurse Juneau, and in her CAC interview. Moreover, testimony from Detective Jeansonne and Officer Alexander established Defendant's pattern of perpetrating sexual abuse upon young girls. The State suggests "Defendant pulled down [A.B.'s] panties, raised her dress, and bent her over a washing machine, as he thrust his penis into her vagina." The State avers A.B.'s testimony at trial did not render her prior accounts of the rape unbelievable to the jury. The State cites *State v. Mangrum*, 20-243 (La.App. 1 Cir. 2/22/21), 321 So.3d 986, *writ denied*, 21-401 (La. 10/1/21), 324 So.3d 1050, in support of its arguments.

---

[6]At trial, defense counsel objected during A.B.'s mother's testimony when she was asked what A.B. told her. A.B.'s mother answered, stating A.B. said that "he had had sex," before the trial court ruled on the objection. The trial court subsequently sustained the objection. The State broached the issue again, asking about the similarity of A.B.'s reports, and the trial court instructed the State to rephrase its question then noted there was a lack of foundation. The objection was then sustained. In brief, Defendant asserts that A.B.'s complaint to her mother was not admissible under La.Code Evid. art. 801(D)(1)(b) because it was not consistent with A.B.'s trial testimony and was therefore inadmissible hearsay. Additionally, he asserts he was deprived of his right to a fair trial. These issues have not been addressed as part of the review of the sufficiency of the evidence because the objections by defense counsel were sustained. Moreover, testimony which may have been erroneously admitted is properly considered when reviewing the sufficiency of the evidence. *See State v. Hearold*, 603 So.2d 731 (La.1992).

14

A.B.'s credibility is at issue in this assignment of error. A.B.'s trial testimony is internally inconsistent and also inconsistent with the statements she gave prior to trial. A.B. told her sister Defendant had sex with her. Detective Greer reported Defendant inserted his penis, but Detective Greer did not state where. Nurse Juneau testified that A.B. reported vaginal and anal penetration. During the CAC interview, A.B. reported anal penetration. During trial, A.B. testified more than once that Defendant did not touch her private parts. She then said Defendant's private part touched her "back side" and her "butt." A.B. subsequently testified that Defendant did not try to have sex with her. She then stated she did not know what part of Defendant's body he used to touch her "back side." A.B. next said Defendant did not do anything weird. She last indicated she told the truth to everyone she talked to. There was approximately ten months between the date of the offense and trial. A.B. was off her medication at the time of the offense. At trial, she was not asked if she was taking medication for schizophrenia.

> The credibility issue in this case is best resolved by looking to jurisprudence.
>
> This court will overturn a jury's credibility assessment only when a witness's own testimony demonstrates that the witness's ability to perceive events was impaired in some way. *See, e.g., State v. Bourque,* 94-291 (La.App. 3 Cir. 11/2/94), 649 So.2d 670, wherein one eyewitness had consumed a large amount of alcohol before the offense and the other was a minor who believed all white men looked alike, and defendant was white.

*State v. Hypolite*, 04-1658, p. 5 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, 1279, *writ denied*, 06-618 (La. 9/22/06), 937 So.2d 381.

In *Mangrum*, 321 So.3d 986, the defendant was convicted of sexual battery of a victim under the age of thirteen. On appeal, the defendant argued that the state failed to present sufficient evidence to support the jury's verdict. At trial, an expert in child abuse maltreatment and sexual abuse testified. The first circuit discussed the remaining evidence presented:

15

At trial, the victim testified and demonstrated that she knew the difference between the truth and a lie and agreed to provide truthful testimony. While she initially stated that the defendant used his hand when he "digged" her private part, as previously noted, she added, "I think" and then admitted that she did not actually know what the defendant used. When asked how it made her feel when her mother did not do anything after the disclosure, she stated, "Sad." By contrast, she noted the following as her grandmother's reaction: "She wanted to make sure that I'm okay. And she took very good care of me." The victim was questioned in graphic terms as to whether she was telling the truth or a lie when she told her mother and grandmother what happened and responded, "The truth." She did not recall telling anyone that her mother had a fight with her father after she told her mother about the incident. The victim confirmed that if someone stated that she saw her mother stab her father with a knife, that would not be the truth. She further confirmed that her trial testimony was truthful.

. . . When the victim was asked if anyone told her what to say at trial, she responded positively. When then asked what she was told, she testified, "My Granny told me that it doesn't matter what they say, as long as I tell the truth. Jesus will be right there beside me to make sure that I do good." When asked if her grandmother ever asked her to tell something or say something that was not true or did not happen, she responded, "No."

On cross-examination, the victim was again asked if she knew how many times the act occurred, and was then asked if she knew whether it happened at all. She responded negatively to both questions. The following colloquy then took place:

Q. It didn't happen at all? You don't know whether it happened at all?

A. I think it happened. I don't remember when.

Q. You don't remember when. Right. But you, do you remember -- I think what you said, you remember you being at a relative's house?

A. (Witness nods head affirmatively).

Q. A family member's house?

A. Yes.

Q. Who else was there?

A. I think it was my two cousins and their mom.

Q. Their mom is named what?

A. I forgot it.

16

Q. [C.M.]?

A. Yes.

After being asked a series of detailed questions, the victim was later asked, "And you think that your dad dug in your private parts, too, correct? But you don't know for sure?" She replied, "I know he did it." When asked why she previously stated that she thinks he did it, she replied, "No. I know he did it. But I don't know how many times he did it."

. . . .

Ms. Knobloch, a forensic interviewer at the CAC in Belton, Texas, at the time, interviewed the victim on August 11, 2016. . . .

Ms. Knobloch asked the victim to tell her what she told her grandmother, and that her grandmother wanted her to tell what happened. The victim stated that she was going to tell her the truth. The victim stated, "One day I was by my friends' house . . .my daddy came in the room, grabbed my hand, take me in the room, push my head down, take all my clothes off, then this hand [holding one finger up], stick it all the way down my tuiee." Seemingly referring to the same day or night, the victim stated, "Then I was in the living room again, he grabbed me, tear my clothes off, turned me around, dig in my butt." When asked what he put in her butt, she stated, "he put his hand [again held one finger up] in my butt then he smelled it." She stated that her father shut the door hard when he entered the room, adding that it was her father's room. She pointed to her vaginal area when asked what a "tuiee" was and pointed to her backside to identify her "butt." When asked what her father was wearing, the victim stated he was wearing "some drawers."

. . . .

In addition to confirming that he and the victim stayed at C.M.'s house overnight at the same time on at least one occasion, the defendant confirmed that he would still occasionally stay at C.M.'s house after he and D.J. ended their relationship. When asked why the allegations against him were made, the defendant testified that A.J. may have initiated the allegations for financial gain, noting that when he met D.J., A.J. did not have money for rent. The defendant also asserted that A.J. "kept sending OCS people out" in an effort to get custody of the victim. When asked if he was tested for drug use by OCS, he confirmed that he was drug screened, that he tested positive for marijuana, and stated, "they found marijuana and stuff." In repeatedly denying ever abusing the victim, he testified, in part, "That's not true. I would never, never. You put a gun to my head and ask me to touch a child, you get ready to blow my brains out. Because I would not do it, or deny my God. I die for them two things." The defendant was sixty-one years old at the time of the trial.

*Id.* at 993–99 (alterations in original) (footnotes omitted).

On appeal, Mangrum noted that even though the victim testified, she did not remember details or the statements she gave to interviewers, the victim did not say in her initial interview that the defendant touched her private parts, the victim's mother denied the victim ever told her the defendant touched her private parts, and the victim testified that her mother did nothing about the allegations but told interviewers that her mother stabbed the defendant when she found out. The defendant argued that due to the victim's admitted untruths and her grandmother's ability to influence her, the victim's credibility was questionable. The first circuit affirmed the conviction because it could not say that the jury's verdict was irrational under the facts and circumstances presented.

Although the supreme court denied Mangrum's writ application, Justice Crichton would have granted and docketed the writ application to examine whether there was sufficient evidence to convict the defendant. Justice Crichton was troubled by the five-year-old victim's inconsistent reports and her indication that she was incentivized by her grandmother to conduct the CAC interview wherein she reported defendant's sexual abuse. He felt that because the victim's testimony and statements were the only evidence to support the conviction, the inconsistencies in her statements and the alleged incentive to provide a statement warranted further review by the court. *Mangrum*, 324 So.3d 1050.

In *State v. Barton*, 20-274 (La.App. 3 Cir. 5/5/21), 319 So.3d 907, *writ denied*, 21-788 (La. 10/12/21), 325 So.3d 1071, *and writ denied*, 21-783 (La. 10/12/21), 325 So.3d 1072, this court addressed the sufficiency of the evidence to support the defendant's conviction for molestation of a juvenile. At issue was the credibility of the victim. This court discussed the evidence presented:

The victim testified that she was six years old in 2015. When asked if she remembered ever having a conversation with Defendant, the victim responded "No" but later testified that she had spoken with him on the phone. The victim testified that she knew the Defendant because he was "with her grandma" and referred to him as "Pa-Pa."

The victim testified that she remembered going to Hearts of Hope but did not remember the conversation she had with the case workers. She remembered coloring but did not remember discussing private parts or the difference between good and bad touches. She did not remember anyone asking if she had been touched in a bad place, but she did remember telling the interviewer that no one had ever touched her. On re-direct, when asked if she remembered her first Hearts of Hope interview where she said that nothing happed, the victim responded, "Yes." However, when asked if she remembered the second time when she said something did happen, the victim replied, "No."

. . . .

The next witness called was Allison Roy, also a forensic interviewer with Hearts of Hope. Ms. Roy testified that she interviewed the victim on June 29, 2015, the second interview. The video of this interview was played for the jury. During this interview, the victim stated that the Defendant touched her in her private part when she was sleeping in the bed with the Defendant and her "maw maw." The victim also told Ms. Roy that Defendant touched her on another occasion, at a motel in Lake Charles, LA. The victim stated that she believed the Defendant was "doing it on purpose" and that her mom said she was going to "kill him."

The next witness, Bridget Dartez, testified that she was a child protection investigator with the Department of Children and Family Services in Acadia Parish. According to Ms. Dartez, during an interview at Hearts of Hope, the victim indicated that her mother told her "not to disclose, not to say anything should she have been touched inappropriately." Ms. Dartez asked the victim's mother permission to interview the victim a second time. Ms. Dartez went to the victim's house and interviewed the victim a second time. Ms. Dartez testified that the victim also told her that the Defendant touched her while sleeping in the bed between the Defendant and her "maw maw." Ms. Dartez testified that, following the interview, she scheduled the second interview with Hearts of Hope. . . .

. . . As for the first Hearts of Hope interview, Ms. Dartez testified that she watched the interview and remembered the victim repeatedly saying that no one ever touched her. Defense counsel asked Ms. Dartez if the victim told the interviewer that her mom instructed her not to say that she was touched; Ms. Dartez answered: "She said that mom told me that, yes, someone did touch me not to say anything. Something along those lines." According to Ms. Dartez, the interviewer asked the victim if she was telling the truth, and the victim answered, "Yes." Ms. Dartez further testified that after the interviewer questioned the victim

19

about her mom, the interviewer again asked the victim if anyone ever touched her. According to Ms. Dartez, the victim replied, "No."

. . . .

The Defense called Ms. Krystal Richard, the victim's mother. She testified that the victim and Ms. Richard's other children called Defendant "Pa Pa." Ms. Richard testified that the victim did tell her that she had been touched but later told her that Defendant did not touch her. On cross-examination, Ms. Richard testified that since the incident in 2015, Defendant has helped her pay bills a couple of times. Since 2015, Ms. Richard explained, she has talked to Defendant on her mom's phone. When asked if her daughters spoke to Defendant, Ms. Richard answered, "At the beginning, yes, the girls were on the phone with him." When asked if her children were ever left alone with Defendant, Ms. Richard replied that her children were alone with her mom while Ms. Richard was at work.

Ms. Richard then stated, however, that Defendant did babysit her children once. Ms. Richard testified that when the victim told her she had been touched, Ms. Richard took her out of the home. Later, however, the victim "c[a]me out and told [her] that she was never touched." According to Ms. Richard, she asked the victim multiple times whether anyone had touched her. When asked if she ever told the victim not to tell "them people," Ms. Richard responded that she did tell the victim that but the term "them people" was in reference to her other children. Ms. Richard stated that it was her intention that the victim not tell her brother and sister about what had happened. Ms. Richard testified that she brought her kids to the doctor, and the doctor testified that "they was [sic] never touched." Ms. Richard explained that she believed her daughter when she stated that she had been touched and that she also believed her daughter when she said she had not been touched. During the day of the interview, DCFS visited with the victim; Ms. Richard testified that she was not present when DCFS spoke with the victim, but her sister was. The morning of the Hearts of Hope interview, Ms. Richard testified, she told the police what the victim told her.

*Id.* at 913–15 (alterations in original). This court concluded:

Considering the victim's second Hearts of Hope interview as substantive evidence, this Court finds that the evidence was sufficient to convict Defendant. . . . Although the victim's second Hearts of Hope interview was inconsistent with the victim's trial testimony, it was consistent with the victim's other prior statement to Ms. Dartez as to one of the episodes of inappropriate touching. This Court finds the jury's decision to believe the victim's prior statements over her in-court testimony was rational, especially considering the evidence of influence by the victim's mother, the victim's contact with Defendant since the allegations, and the financial assistance given to the victim's mother by Defendant.

20

*Id.* at 916–17.

In *State v. Broussard*, 95-792 (La.App. 3 Cir. 12/6/95), 664 So.2d 835, the defendant was convicted of oral sexual battery for performing oral sex on the six-year-old victim and making her perform oral sex on him. On appeal, the defendant argued the evidence was insufficient to support his conviction because the victim's videotaped statement and her trial testimony conflicted as to whether he forced the victim to engage in oral sex while sitting in a rocking chair. In her videotaped statement, the victim stated that while in a rocking chair, the defendant made her "suck his bottom and he licks mine." *Id.* at 839. At trial, the victim testified that all she remembered occurring in a rocking chair was the defendant kissing her. The victim's mother testified the victim told her the defendant made her suck his penis while they were on a reclining chair. This court found the evidence, when viewed in a light most favorable to the prosecution, showed the defendant made the victim perform oral sex. This court further stated:

> We decline Broussard's invitation to review the jury decision and accord greater weight to T.C.'s trial testimony. The jury was free to ascribe T.C.'s trial testimony whatever weight it judged reasonable, or none "at all" if it found T.C.'s taped testimony and the recollection of her mother were more credible and accurate. The record supports the jury's findings, and we will not reevaluate the credibility of the witnesses. *See State v. Pontiff*, 604 So.2d 71 (La.App. 3 Cir.1992).

*Id.* at 840.

In *State v. Alfaro*, 13-39 (La.App. 5 Cir. 10/30/13), 128 So.3d 515, *writ denied*, 13-2793 (La. 5/16/14), 139 So.3d 1024, there was no medical evidence of sexual abuse introduced. The jury viewed the videotape of K.F.'s statement taken at the CAC in which she detailed the years of sexual abuse she endured by the defendant. At trial, however, K.F. testified that her previous allegations were false and that the defendant did not sexually abuse her. The fifth circuit found that in returning verdicts of guilty as charged, the jury clearly discredited K.F.'s trial

testimony and accepted her CAC interview. The court noted this was within the jury's discretion and upheld the defendant's convictions for aggravated rape and molestation of a juvenile.

The present case before this court is similar to *Mangrum* and *Barton* inasmuch as the victims gave inconsistent statements and testimony. However, the case at bar is distinguishable in that there was no testimony that A.B.'s reports or testimony were influenced by her mother, who continued to have contact with Defendant after A.B.'s allegations and told Defendant's mother Defendant did not rape A.B. In *Mangrum*, *Barton*, *Broussard*, and *Alfaro*, the defendants' convictions were affirmed despite inconsistencies and recantations. In the case at bar, A.B.'s mother testified that A.B. forgot things as a result of her schizophrenia. The jury could have accepted that statement as an explanation for the inconsistencies in A.B.'s trial testimony and between her trial testimony and her prior reports. The verdict clearly indicates the jury found A.B.'s pretrial reports of abuse credible. As noted in *Broussard*, the jury was free to assign A.B.'s trial testimony whatever weight it judged reasonable or none at all. We decline to give more weight to A.B.'s trial testimony than her pretrial reports and do not second-guess the jury's credibility determination. Thus, the Defendant's conviction should be affirmed.

## ASSIGNMENT OF ERROR NO. 2:

In his second assignment of error, Defendant contends the hearsay testimony of Detective Greer describing A.B.'s complaint of rape was not an initial report and was inconsistent with A.B.'s trial testimony. Therefore, Detective Greer's testimony was not admissible pursuant to La.Code Evid. art 801(D)(1)(d).

Detective Greer was asked to tell the jury about his conversation with A.B., and defense counsel objected, alleging such testimony was hearsay. That objection was overruled. Detective Greer subsequently testified:

She said that Anthony was giving her alcoholic beverages, that she [sic] while they were in the vehicle he continued to touch her, saying that he would like to touch her more, see more of her body. When they got to the house that he pulled her panties down and he inserted his penis and he did ejaculate.

Defense counsel objected again. The trial court noted the objection and its continuing nature.

Defendant argues the trial court erred in allowing Detective Greer to testify as to A.B.'s statements because those statements were not the initial complaint of sexually assaultive behavior. Moreover, the statements given to Detective Greer were not consistent with A.B.'s trial testimony.

The State suggests the statements made to Detective Greer were close enough in time to the event at issue that they could have been either a first disclosure or an excited utterance.[7] However, to the extent Detective Greer's testimony was hearsay, it constitutes harmless error inasmuch as it is cumulative of testimony given by Sarena and Nurse Juneau and the statements made by A.B. during her CAC interview.

Louisiana Code of Evidence Article 801(D)(1)(d) provides:

> **D. Statements which are not hearsay.** A statement is not hearsay if:
>
> **(1) Prior statement by witness.** The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
>
> . . . .
>
> (d) Consistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior.

---

[7]The possibility that the statements by A.B. to Detective Greer could be an excited utterance was not raised in the trial court. Moreover, an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." La.Code Evid. art. 803(2). Testimony indicated the statement was made at least six hours after the event. (R. pp. 104, 115.) In *State v. Griffin*, 45,045 (La.App. 2 Cir. 1/27/10), 30 So.3d 1039, *writ denied*, 10-447 (La. 9/17/10), 45 So.3d 1043, the court found a statement made by the robbery victim to police during an interview conducted inside the victim's home approximately fifteen minutes after police arrived and after police had already arrested defendant was not an excited utterance.

The 1988 Official Comments to this provision provide in pertinent part: "It is only the initial complaint by the victim, whether made to a family member, policeman, or other person, that is defined as non-hearsay under this provision. Subsequent complaints or reports about the same crime would not be admissible under it." La.Code Evid. art. 801(D)(1) cmt. e.

The admissibility of Detective Greer's testimony can be further addressed by looking to *State v. Hilton*, 99-1239 (La.App. 1 Cir. 3/31/00), 764 So.2d 1027, *writ denied*, 00-958 (La. 3/9/01), 786 So.2d 113, which was cited by the State. In that case, the court concluded the statements made by the child victims to Margaret Ryals, an employee of the Washington Parish Office of Community Services, did not constitute the initial report of sexual abuse and were inadmissible because the initial report was actually made to Shay Hilton, a cousin of the victims, the day before the statements were made to Ms. Ryals.

A.B.'s statements to Detective Greer were not her first complaint of sexually assaultive behavior inasmuch as she had already reported the incident to both her sister and her mother. Thus, the trial court erred in overruling defense counsel's objections.

However, in *State v. Smith*, 418 So.2d 515, 522 (La.1982), the supreme court held that "inadmissible hearsay which is merely cumulative or corroborative of other testimony adduced at trial is harmless." Nurse Juneau's testimony and A.B.'s statements in the CAC interview indicated penile penetration and ejaculation. Thus, Detective Greer's testimony was cumulative, and its admission was harmless. Accordingly, Defendant's second assignment of error lacks merit.

### DECREE

For these reasons, Defendant's conviction should be affirmed.

**AFFIRMED.**