NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**23-705**

**STATE OF LOUISIANA**

**VERSUS**

**QUINTIN M. SMITH**

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 230404 B
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

**********

**GUY E. BRADBERRY**
**JUDGE**

**********

Court composed of Candyce G. Perret, Gary J. Ortego, and Guy E. Bradberry, Judges.

**AFFIRMED.**

**Charles A. Riddle, III**
**District Attorney**
**Anthony F. Salario**
**Andrea Ducote Aymond**
**Assistant District Attorneys**
**Twelvth Judicial District Court**
**P.O. Box 1200**
**Marksville, LA 71351**
**(318) 253-6587**
**COUNSEL FOR:**
     **State of Louisiana**

**Edward K. Bauman**
**LA Appellate Project**
**P.O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Quintin M. Smith**

**BRADBERRY, Judge.**

On February 17, 2022, Defendant, Quintin M. Smith, was charged by bill of indictment with first degree rape of a victim under the age of thirteen, in violation of La.R.S. 14:42.  On November 29, 2022, Defendant was convicted as charged by a unanimous jury verdict.  Defendant filed a "Motion for New Trial, Motion to Continue Sentencing Hearing, & Request for Transcript of Trial" on May 23, 2023. The motion for new trial and motion to continue were both denied at a hearing.  After waiving the sentencing delays, Defendant was sentenced to the mandatory term of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.  The trial court granted Defendant's "Notice of Appeal with Designation of Record and Motion to Appoint Appellate Counsel" on June 14, 2023, and he is now before this court alleging one assignment of error.  For the following reasons, we affirm Defendant's conviction.

## FACTS

Between 2013 and 2016, Defendant raped his daughter, Q.S., who was under the age of thirteen at the time of the offense.[1]

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record.  After reviewing the record, we find there are no errors patent.

---

[1]The victim's initials are used in accordance with La.R.S. 46:1844(W).

**ASSIGNMENT OF ERROR**

In his sole assignment of error, Defendant argues that the evidence was insufficient to find him guilty of first degree rape. This court has discussed the standard of reviewing claims of insufficient evidence as follows:

> When the issue of sufficiency of evidence is raised on appeal, the reviewing court determines whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). Discretion in determinations of credibility is vested in the jury, which may accept or reject testimony within the bounds of rationality, and we will only impinge upon its discretion "to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Ryan*, 07-504, p. 2 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268, 1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727).
>
> . . . .
>
> . . . "Louisiana jurisprudence has consistently held that the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even if there is no physical evidence." *State v. Simon*, 10-1111, p. 7 (La.App. 3 Cir. 4/13/11), 62 So.3d 318, 323 (quoting *State v. Leyva-Martinez*, 07-1255, pp. 6–7 (La.App. 3 Cir. 4/30/08), 981 So.2d 276, 282, *writ denied*, 08-1200 (La. 1/30/09), 999 So.2d 747), *writ denied*, 11-1008 (La. 11/4/11), 75 So.3d 922. Further, "[i]n the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion." *State v. Robinson*, 02-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79, *cert. denied*, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004).

*State v. Thomas*, 17-959, pp. 13–15 (La.App. 3 Cir. 9/26/18), 255 So.3d 1189, 1199–1200 (alteration in original), *writ denied*, 18-1757 (La. 4/22/19), 268 So.3d 294, *writ denied*, 18-1662 (La. 4/22/19), 268 So.3d 303.

2

At the time of the commission of the offense, La.R.S. 14:41 defined rape as[2]:

A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.

B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.

C. For purposes of the Subpart, "oral sexual intercourse" means the intentional engaging in any of the following acts with another person:

(1) The touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender.

(2) The touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim.

Louisiana Revised Statutes 14:42 defined first degree rape, in pertinent part, as[3]:

A. First degree rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

. . . .

(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

The first witness to testify at trial was Detective Michael Cammack with the Avoyelles Parish Sheriff's Office. For the last several years, Detective Cammack investigated special victim crimes which he indicated involved allegations of

---

[2]Louisiana Revised Statutes 14:41 has since been amended. 2022 La. Acts No. 173, § 1. However, it is well-settled that "the law in effect at the time of the commission of the offense" applies. *State v. Sugasti*, 01-3407, p. 4 (La. 6/21/02), 820 So.2d 518, 520.

[3]Louisiana Revised Statutes 14:42 has since been amended. 2022 La. Acts No. 173, § 1. Again, "the law in effect at the time of the commission of the offense" applies. *Sugasti*, 820 So.2d at 520.

physical or sexual abuse to children. On August 2, 2021, a report was made that alleged Defendant engaged in indecent behavior with a fourteen-year-old child, Q.S. Detective Cammack's investigation revealed the alleged sexual misconduct occurred when the child was six to nine years old. After Detective Cammack contacted the Child Advocacy Center (CAC), a forensic interview with Q.S. was conducted on August 6, 2021. According to Detective Cammack, Q.S. disclosed sexual acts committed by her father which, based on his education and experience, constituted first degree rape and molestation of a juvenile. Detective Cammack said in the case of delayed reporting, it is not often that the police can recover physical evidence. Delayed reporting is not uncommon for children, especially when the perpetrator is related to the victim. Detective Cammack testified that Defendant was in his thirties at the time.

Rebecca Mayeux was a sex offender coordinator with the Avoyelles Parish Sheriff's Office. One of her duties included registering convicted sex offenders who resided or worked in Avoyelles Parish. Deputy Mayeux testified that Defendant had been convicted of attempted indecent behavior with a juvenile on November 10, 2009.[4] Following his release from prison, Defendant registered as a Tier-1 sex offender on July 30, 2013. Deputy Mayeux stated that a Tier-1 sex offender had to register once a year for fifteen years. The State introduced the certified court minutes from Defendant's prior conviction into evidence.

Kelly Cleveland was a forensic interviewer at the CAC in Alexandria. Ms. Cleveland interviewed Q.S. on August 6, 2021, when Q.S. was fourteen years old.

---

[4]According to the bill of indictment, Defendant had been charged with the aggravated rape of K.P., a victim under the age of thirteen, on October 23, 2008. Aggravated rape is now designated as first degree rape. "[A]ny reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape." La.R.S. 14:42(E).

The recorded interview was entered into evidence without objection as State's Exhibit 2 and played for the jury. In the CAC interview, Q.S. said she was six when Defendant got out of jail, and Defendant began inappropriately touching her shortly thereafter. Because she was excited to have her father back home, she did not say anything about the touching. Q.S. said she had recently been told by her birth mother that Defendant had been in jail for raping her older sister, a fact which her grandmother confirmed.

Q.S. said that when she was about nine years old, she had a nightmare and went into Defendant's bedroom to sleep with him. Defendant tried to put his "thing" in her butt but stopped; he went to use the bathroom and then went back to bed. She said the touching usually happened when her grandmother was gone, but if her grandmother was home, Defendant would touch her while putting her to bed for the night. One time, Defendant was watching porn when Q.S. entered the room. Q.S. said she did not want to "do it" with Defendant, so she "compromised" by giving Defendant a blowjob. According to Q.S., a blowjob was when she put her mouth or her hand on his "thing" until he "came." Q.S. stated Defendant would also touch his "thing," would rub his "thing" against her private part, and would try to "push his thing in as far as it would go." Q.S. clarified that Defendant put his "thing" in her butthole or "other hole," which she said was painful. On the day prior to the CAC interview, Q.S. said that Defendant called her to say he was going to "off himself" if he went back to prison. Q.S. did not want Defendant to go back to prison.

At trial, Q.S. said her date of birth was October 26, 2006. Q.S. testified that she had lived with her grandmother, who she sometimes called mom, for most of her life. At one point, Q.S. lived in the same house as Defendant. She could not recall

5

exactly when she lived with him, but she testified that it was when he got out of jail.

Q.S. thought she was around five or six years old.

> A.     For the most part I would have to give him BJs, if you know what that is.
>
> Q.     No, can you tell us, I'm sorry we ... just to make sure everybody has the same understanding.
>
> A.     Blow jobs.
>
> Q.     O.K.  Did any part of your dad's body go into any part of your body?
>
> A.     He would ... very much so try... I remember one of the times I had a nightmare so I went [to] sleep with him and he tried to take advantage of me.  And I had woke up in the middle of it.
>
> Q.     How had he tried to take advantage of you, [Q.S.]?
>
> A.     He ... he ... I was ... (tearing up) I'm sorry...
>
>         . . . .
>
> Q.     Let me ask you this. Did any ... at any time did your dad's private parts touch any of your private parts?
>
> A.     Yes.
>
> Q.     Did his front private part ever touch any of your private parts?
>
> A.     Yes.
>
> Q.     Can you tell me which of your private parts, your dad's front private part touched?
>
> A.     You mean when he ... like what do you call it, I don't know if I should [say] a kid[']s term for it.
>
> Q.     However you can.
>
> A.     The vagina.
>
> Q.     Did his private part go inside of your vagina?
>
> A.     He would try most part he could just get the top and I'd try to push him off a little bit.

Q. How did that make you feel, [Q.S.]?

A. Oh it hurt.

Q.S. said she would tell Defendant if it started hurting her, but he would try "to push a little bit more." Q.S. could not recall whether Defendant's "front private part" ever went into her behind, but she said it did go into her mouth. According to Q.S., this happened a lot. Defendant told Q.S. not to tell anyone because he might get in trouble and have to go back to jail. Q.S. did not want him to go back to jail, which was one reason she did not tell anyone about the sexual misconduct. The first adult she told was her birth mother. After Q.S. identified Defendant in the courtroom, the following colloquy ensued:

Q. We're almost finished. So [Q.S.], . . . when did it stop, about how old were you?

A. Nine.

Q. And that's when you moved?

A. NO VERBAL RESPONSE...

Q. And his private part did touch, go inside your front girl's private part?

A. Not fully but yes.

Q. And also in your mouth?

A. Yes.

On cross-examination, defense counsel asked Q.S. about her statement during the CAC interview where she indicated that she wanted to live with her birth mother when Ms. Cleveland asked Q.S. what she wanted to happen with the case. Q.S. had not lived with her birth mother since she was about one year old. Q.S. said that she went to live with her birth mother for a period of time when she started having arguments with her grandmother.

7

Q.     So earlier Ms. Aymond, the one that was just talking to you, asked you about whether any of your dad's private parts went into your ... any of your private parts, you said not in the like front area yes but back area no. Is that what I understood you to say?

A.     Yes, sir.

Q.     O.K. Because on the video you did say there [were] lots of times it happened in the back area as well.

A. I could be mistaken because I had given and talked to the child services whenever and did all that.  But the most part I tried to forget about it …

Q.S. thought Defendant had went to jail for "a rape or sexual assault against one of [her] older siblings[,]" but she did not know the whole story or whether it was true.  Q.S. believed her sibling was her birth mother's child.  Q.S. said that everything she said at trial was true.  Following Q.S.'s testimony, the State rested its case-in-chief.

Defendant testified in his own defense.  Defendant said Q.S. was a "pretty decent child" and was attached to his hips.  However, he said that it got a bit rougher when Q.S. became a teenager. Defendant testified he had pled guilty to attempted indecent behavior with a juvenile, because he was threatened with a life sentence and did not have anyone to fight for him.  Defendant served five years in prison and got released when Q.S. was almost seven years old.  Defendant had sole custody of Q.S. until his mother, Jane Smith, adopted her.  Defendant denied that he did any of the things Q.S. accused him of doing.  He said Q.S.'s "mother is quite manipulative and she's attempted this before which is the reason I went [and] did time the first time."

On cross-examination, the State asked Defendant about his prior conviction. The bill of indictment alleged he committed oral sexual intercourse with K.P., a child under the age of thirteen.  Defendant said K.P. was his stepdaughter.  According to

Defendant, Samantha Percell accused him of having her daughter, K.P., give him blowjobs. Samantha Percell was also Q.S.'s birth mother. The State questioned Defendant about the relationship between Q.S. and her birth mother:

> Q.    All right. So it's your contention that when she became a teenager she had some contact with her mother [for the] first time in a long time and all of a sudden all this stuff gets developed?
>
> A.    Correct.
>
> Q.    And that's just your idea? I mean you didn't play any role in any conversations or hear of any conversations anything like that?
>
> A.    No, never.
>
> Q.    That's your justification for describing what your daughter is saying about you?
>
> A.    Exactly.

Defendant said it was possible that Samantha taught Q.S. the sexual terms and helped her fabricate the different locations, acts, and bad dreams to frame him. Defendant indicated that he did not have custody of Q.S., and Samantha did not have custody of Q.S. The defense called no further witnesses and rested its case.

In brief to this court, Defendant summarizes his argument as follows:

> The jury chose to accept the testimony of QS, that her father, Mr. Smith, had her perform oral sex on him, and that Mr. Smith also attempted vaginal sex, at the very least. As QS's testimony was internally inconsistent on key issues, it could not form the sole basis for a conviction. The evidence introduced at trial was based upon statements made by QS, with no other evidence offered to corroborate even a portion of her testimony. Although QS's allegations touch one's paternal or maternal instincts, they lacked the specificity or reliability that should be required to sustain a conviction on charges that carry a sentence of mandatory life imprisonment.
>
> For these reasons, the State failed to carry its burden of proving the necessary elements of the charged offense of first degree rape beyond a reasonable doubt. Therefore, Mr. Smith's conviction should be reversed, his sentence should be vacated, and a judgment of acquittal should be entered.

Defendant calls Q.S.'s credibility into question insomuch as her trial testimony was inconsistent with her statements during the CAC interview, and there were no corroborating witnesses called to testify. During the CAC interview, Q.S. reported anal penetration. Specifically, she said Defendant tried to put his "thing in [her] butt." At trial, Q.S. testified that Defendant tried to put his "thing" in her vagina but could not recall whether Defendant attempted anal penetration. Defendant also notes that Q.S.'s birth mother, grandmother, other family members, and friends were not called to testify for corroboration. Based on the conflict between Q.S.'s CAC statements and her trial testimony, Defendant suggests there are internal contradictions and irreconcilable conflicts which cause reasonable doubt to exist in this case.

The State proposes the testimony of the victim alone is sufficient to establish the elements of the offense, and credibility determinations are within the province of the jury as the trier of fact. Q.S. gave consistent accounts of the rape to her mother and in her CAC interview, and she continued to be detailed and consistent in her trial testimony. Thus, the evidence was sufficient to support Defendant's conviction. In support of its argument, the State cites *State v. Mangrum*, 20-243 (La.App. 1 Cir. 2/22/21), 321 So.3d 986, *writ denied*, 21-401 (La. 10/1/21), 324 So.3d 1050. Therein, the defendant noted that even though the victim testified, she did not remember details or the statements she gave to interviewers, the victim did not say in her initial interview that the defendant touched her private parts, the victim's mother denied the victim ever told her the defendant touched her private parts, and the victim testified that her mother did nothing about the allegations but told interviewers that her mother stabbed the defendant when she found out. The defendant argued that due to the victim's admitted untruths and her grandmother's

10

ability to influence her, the victim's credibility was questionable. The first circuit affirmed the conviction because it could not say that the jury's verdict was irrational under the facts and circumstances presented.

We find the evidence presented was sufficient to prove sexual intercourse beyond a reasonable doubt. Q.S. affirmatively testified that Defendant penetrated her vagina, which she said was painful, and Q.S. testified that she performed oral sexual intercourse on Defendant at his insistence. Though Defendant claims there is a fatal inconsistency as to whether anal penetration occurred, that argument raises the issue of credibility.

In *State v. Craft*, 22-553, p. 24 (La.App. 3 Cir. 2/1/23), 355 So.3d 1237, 1253 (alteration in original), *writ denied*, 23-287 (La. 10/10/23), 371 So.3d 456, this court said:

> Physical and scientific evidence are not required to convict Defendant. The victim's testimony alone can be sufficient to establish the elements of a sexual offense. *State v. Thacker*, 13-516, p. 15 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, (quoting "*State v. Ware*, 11-337, p. 4 (La.App. 3 Cir. 11/23/11), 80 So.3d 593, 597, *writs denied*, 11-1391 (La. 3/9/12), 84 So.3d 549, and 12-46 (La. 8/22/12), 97 So.3d 358).
>
> > Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon*, 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.
>
> *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, (alteration in original), *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138.

The jury heard any minor contradictions between the precise details of the rape. Q.S. consistently reported that Defendant vaginally raped her, though she

could not recall anal penetration at trial. There were several years between the date of the offense and trial. The jury was free to ascribe Q.S.'s trial testimony however much weight it judged reasonable, or no weight at all if it found Defendant's testimony more credible. The record supports the jury's findings, and the jurisprudence has consistently held that it is not this court's function "to assess the credibility of witnesses or to reweigh the evidence." *State v. Barton*, 22-642, p. 5 (La.App. 3 Cir. 2/15/23), 357 So.3d 907, 912 (citing *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442). The evidence, when viewed in a light most favorable to the prosecution, was sufficient to prove Defendant committed a first degree rape upon Q.S.

Accordingly, we affirm Defendant's conviction.

### CONCLUSION

Defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.